Walter Smith tracts, and the other real estate of the bankrupt a year or more ago. Whereupon Smith went into bankruptcy, filed his petition for exemptions, including the homestead exemption, and procured a restraining order from the then judge of the United States district court, putting a stop to the sales ordered by the state court. Thus the case stood in February last, when a motion was made at Alexandria by the counsel of Mrs. Anderson and other creditors for a dissolution of the restraining order of the bankrupt court. This motion, after extended argument, was granted by HUGHES, District Judge, as to the sales of the Meadowville and the Walter Smith land, on the ground that it was not shown that any credits claimed to be not allowed, even if allowable, could affect the amounts due upon these two estates, both incumbered beyond their value by undisputed liens. But the restraining order was continued upon the other tracts of land belonging to the bankrupt. The commissioners of the state court thereupon readvertised the two named estates for sale. Against this order of the district court an appeal was taken to the supervisory power of the circuit court, and after elaborate argument again of the case before the circuit court, that court affirmed the decree of the district court. To this decree of affirmation by the circuit court no appeal has been or can be taken to the supreme court of the United States. But the assignees of the bankrupt went before the judge of the circuit court of Culpeper county with a bill of injunction setting out an ex parte statement of facts, and suppressing the fact that the cause had been twice heard and decided in the district and circuit courts of the United States, and asking of this state court an injunction against the sale about to be made by the commissioners of the circuit court of Spottsylvania. Injunctions under the practice in the state courts are allowed on ex parte motion without notice to the adverse party; and so, on this prayer for an injunction, the Culpeper circuit judge awarded an injunction against the order of the Spottsylvania circuit judge. This order having been obtained by assignees in bankruptcy, who are officers of the United States court and under its control, upon a sworn statement, suppressing the fact that the cause had been twice heard and decided against the prayer of their petition, the bankrupt court made an order on April 10th, 1874, requiring these assignees at once to dismiss their bill of injunction in the state court, and to appear in Richmond on the 5th of May, 1874, to show cause why they should not be removed as assignees and why they should not be attached for contempt. On the return day of the order to show cause, the assignees purged themselves of contempt; but THE COURT nevertheless removed them from office, and appointed another assignee of this bankrupt's estate.

## Case No. 12,979.

### In re SMITH et al.

### Ex parte AUGUST.

[2 Hughes, 307.] [1]

Circuit and District Courts, E. D. Virginia. Feb., 1874.

HOMESTEAD EXEMPTION — PARTNERSHIP ASSETS — ALIENATION—PURCHASER.

1. The homestead exemption allowed by the laws of Virginia to housekeepers and heads of families cannot be set apart out of the assets of a partnership of which the housekeeper or head of family is a member.

2. Property set apart as a homestead under the laws of Virginia cannot be alienated by a husband without the joint act of his wife. Code 1873, §§ 9, 11, 12, pp. 1171–1173.

3. A purchaser of property improperly exempted to the vendor of it, and sold by him without the joint action of his wife, takes no title, and will be required on proper application to relinquish the property.

[4. Cited in Re McKenna, 9 Fed. 29, to the point that a summary petition to recover possession of property withheld by the bankrupt is the proper remedy for the assignee, and not a plenary suit by bill, or an action at law.]

The assignee in bankruptcy [B. T. August] petitioned for a restitution of property improperly taken by the bankrupts [Smith & McCurdy] in lieu of homestead exemptions, and sold by them to a purchaser who was cognizant of the facts affecting the title to the property at the time of his purchase.

The bankrupts were partners, and dealers in house-furnishing articles, chinaware, and the like goods, on Broad street, Richmond, Virginia. They filed their petition in voluntary bankruptcy on the 14th of July, 1873, and on that day were adjudicated bankrupts. They surrendered no individual property, and no other property, except their stock of goods, the cost price of which was about $5,000. They reported debts in their schedules to the amount of about $5,700. The stock of goods would seem to have been unpaid for. Nevertheless, they filed a petition on the 18th of July setting forth that they were householders and heads of families, and claiming, besides other exemptions, that given to heads of families to the amount for each of $2,000. On the same paper containing their petition for the homestead, and on the same day, the district court (Judge Underwood) made an order appointing two appraisers "to value and set apart to the bankrupts the amount of property allowed them by the constitution of Virginia, to wit, $2,000 each, or such part thereof as they may have;" and the order further directed "that, until said appraisement, the said Smith & McCurdy shall remain custodians of their property." This was all that was contained in the order of the district court of the 18th of July, 1873. But the order was illegal in the implication it carried, that a homestead ex-

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

emption could be allowed out of social assets at all, and out of property the purchase-money for which had not been paid.

The appraisement was made, and was reported on the 19th of July. No proceedings were afterward had in court to ascertain whether the goods so appraised and set apart had been paid for, which was a constitutional prerequisite to their being available as an exemption to the head of a family. The appraisers reported that the value of the whole property was $3,000, and that they had set aside to each of the bankrupts goods to the value of $1,500; but no separate inventory of the articles set apart to each was then or at any time afterwards made, according to the requirements of the Virginia act of assembly relating to such exemptions. In fact, the report of the appraisers was not true in asserting that they "had set aside goods to the value of $1,500 to each;" for there was no such division or separation of the stock of goods at all. Being then mere custodians of the goods under the order of the court, before any of the steps had been taken which were necessary under the Virginia act of assembly to give power to either of these heads of families to alienate the goods thus designated as an exemption in lieu of a homestead, their wives, if they had any, not joining in the disposal of them as that act requires of property exempted in lieu of the homestead, these bankrupts went on to sell the stock of goods, as if the order of the court and the action of the appraisers which had been described had vested the property in them with unrestricted power to sell. They sold for awhile at private sale from the storehouse, on Broad street, which they had occupied; and on the 7th and 8th August they closed out the stock at auction. On the 9th the assignee in bankruptcy was appointed. The principal purchaser of this stock of goods was C. L. Foster, who had been acquainted for a few months with McCurdy, and was brother-in-law of Smith, the two having married sisters. Foster bought at private sale to the extent of $1,212, and then at auction to the amount of $336, his whole purchase amounting to $1,548, or more than half the gross proceeds of the stock of goods. He sent these goods to the auction house of Redwood & Crenshaw, Main street, Richmond, and Smith went down there to act as auctioneer or crier for that firm, the goods of Foster being placed in his custody, and Foster giving him a power of attorney to sell them. Foster was not a merchant and not a dealer in such goods. He describes himself as a builder of railroads and as a collector of taxes in the township of Buckingham county, Virginia, in which he lives; and says that in August, when this purchase was made, he was writing in the county treasurer's office in Buckingham and in the bank at Buckingham courthouse.

On October 30th, 1873, the circuit court of the United States, sitting here, made an order denying the exemption to the said bankrupts, reversing and setting aside the order of the district court of July 18th, and directing the district court to proceed to collect the assets which had been set aside as described. On the 2d of February, 1874, the assignee in this case, B. T. August, filed his petition in this court, praying that Smith and Foster might be made parties thereto, and required to show cause why the goods in the possession of Smith, at Redwood & Crenshaw's, claimed by Foster as his property, should not be delivered to the assignee. Previously, on the 20th of January, this court, on affidavit by the assignee that these goods had been secreted and were in the possession of Redwood & Crenshaw, had ordered the marshal to take possession of them, and they are now in the custody of that officer, subject to the order of this court. On February 20th Foster filed his answer to the assignee's petition, in which he claims that he purchased these goods, for full consideration, of Smith & McCurdy, and paid for them. In this answer Foster alleges that after this property had been set apart to Smith & McCurdy, as has been described, "and had been delivered to them as their exemption or household, in pursuance of the order of said United States district court, or the judge thereof, the said Smith & McCurdy had and held possession thereof as they rightfully and lawfully might do; and that afterwards said Smith & McCurdy, as owners thereof, made sale thereof for their own benefit, etc., etc., etc.; and that this respondent having knowledge of the order and decision of said court or judge, and in full reliance, etc., purchased," etc., etc. In his deposition taken before the commissioner, Foster says that when he made the purchase he was advised of the exemption of homestead allowed to the bankrupts out of this stock of goods, by order, etc.; adding distinctly, "I saw the order itself." He claims that the sale to him was a valid sale; that it was bona fide on his part; that the goods are lawfully his own, and that they cannot now be made assets in the hands of the assignee. There is no denial of the identity of the goods at Redwood & Crenshaw's with those bought by Foster of Smith & McCurdy. A portion of the original purchase has indeed been sold; but there are left of them goods to the value of about $1,000, according to Smith, and of $1,206 or $1,400 according to Foster.

John B. Young, for assignee.
James Neeson, for purchaser, C. L. Foster.

HUGHES, District Judge. It is unnecessary to inquire whether the purchase of Foster was in good faith. Were the bona fides perfect on his part, it could not be sustained. Smith & McCurdy had no power, either under the order of the district court, given on the 18th July, or under the law of Virginia relating to the homestead, to sell the goods.

Foster confessedly had knowledge that these goods were set apart and exempted in lieu of the homestead. He claims to have seen the order. He knew that the order treated the goods as property thus exempted. He knew that it did not, in its terms or purport, give power to Smith & McCurdy to alienate them. He was bound to have knowledge that the laws of Virginia expressly forbade the alienation of personal property exempted in lieu of the homestead except by the joint act of the husband and wife. Smith & McCurdy, not being the owners of the property, and Foster having notice of the fact, it cannot be claimed that their sale to him was valid to pass a title in the goods. That the order of the district court gave power to Smith & McCurdy to sell the goods cannot be pretended. The only effect of that order, as far as its terms go, was to fix the character of the exempted property upon the goods. It was afterwards, at some future time, for the court to ascertain whether the purchase-money for the property had been paid, and whether it was in other respects property which could be held as an exemption; and if so, then to prescribe the manner in which the property should be held and managed for the benefit of the family. Yet before any other action of the court in these respects could be had, these bankrupts, in a few days, sold the whole stock of goods as their own absolute property, and Foster bought part of them, having before his eyes the order of the court giving no such power, but fixing the character of this property. There being nothing in this order of the 18th July giving Smith & McCurdy power to sell, was there anything in the laws of Virginia on the subject of homestead conferring a power to sell on the men who had custody of it under the order of court? This order expressly refers to the constitution of Virginia.

The eleventh article of this constitution provides for the exemption of a homestead to the householder or head of a family. In section 5 it empowers the legislature to prescribe by law in what manner and on what conditions the head of a family may hold "for the benefit of himself and family such personal property" as may be exempted. The legislature accordingly did prescribe how property should be set apart and held as an exemption. It first gives directions in regard to real estate, among other things providing, in section 7, c. 183, of the Code, that the homestead shall not be alienated except by the joint act of husband and wife, if both are alive. It then, in section 11, directs how personalty may be set apart as an exemption; and in section 12 directs that an exemption in personalty shall be held in the same manner, under the same limitations, and subject to the same conditions, as to incumbrance and sale, and in all other respects as had been provided in regard to a homestead in realty. Plainly, under these provisions of the Virgina law of

homestead, these men, Smith & McCurdy, had no title as individuals to this property; and no title in it whatever under the order of court, except as an exemption for the benefit of the family, in their character of heads of families, without power to alienate except jointly with their wives, and then only for the purpose of reinvestment in some other property to be held as an exemption. Therefore Smith & McCurdy had no power to sell. Foster had full notice that this was a family exemption, and was bound to know the provisions of the laws of Virginia denying to them that power. It is a plain principle of law that a person who buys goods (otherwise than in market overt) acquires no better title than that possessed by his immediate vendor, even though such purchaser buys bona fide, without notice of any infirmity of title on the part of his vendor. Here Foster bought with full notice of facts which, as he was bound in law to know, negative the right of the vendors to sell. He therefore acquired no right to the goods by his purchase. To allow such a purchase as this to stand would be to establish a pernicious precedent.

The goods in question must therefore be taken possession of by the assignee as part of the assets of these bankrupts.